**MICHIGAN MILK PRODUCERS ASSOCIATION, a Michigan corporation, Plaintiff,**

v.

**COMMERCIAL UNION INSURANCE COMPANY, a Massachusetts corporation, Defendant.**

**No. G76–138 CA.**

United States District Court, W.D. Michigan, S.D.

June 10, 1983.

Foster, Swift & Collins, P.C., by Philip T. Carter, Lansing, Mich., for plaintiff.

Fitzgerald, Young, Peters, Dakmak & Bruno by Neill T. Peters, Detroit, Mich., for defendant.

## OPINION

HILLMAN, District Judge.

This is a diversity case in which the court's decision turns on an unanswered question of Michigan law. The issue before the court is the apportionment of liability for pre-judgment interest among an insured party and its primary and excess insurers. The court has taken testimony and extensive briefs have been submitted. Pursuant to Fed.R.Civ.P. 52(a), the court enters the following findings of fact and conclusions of law.

## FACTS

On April 6, 1960, near Millington, Michigan, a self-propelled passenger railcar owned by New York Central Railroad (NYCR) was damaged in a collision with a truck driven by Reuben Bush. Bush was

driving a vehicle owned by Elmer Myers, who was a contract hauler engaged in transporting milk for Michigan Milk Producers Association (MMPA), plaintiff in this action. The collision killed one passenger, injured several others, and caused extensive damage to the railcar. MMPA, NYCR, and Myers were all sued by the injured passengers. NYCR sued Myers and MMPA in Wayne County Circuit Court.

Myers was insured by the Wolverine Insurance Company with limits of $10,000. Wolverine settled the case as to Myers on the date of trial, paying $9,500 to the railroad. Subsequently, the liability of MMPA was strenuously litigated. NYCR argued that Myers was an agent of MMPA, and that MMPA was thus liable under a theory of respondeat superior for damages to the railcar. After many years of litigation in the Michigan courts, including two trials and an appeal, NYCR prevailed, and MMPA was held liable as Myers' principal for $97,-618.77.

During the pendency of the litigation, the Michigan Legislature enacted a statute now codified at M.C.L.A. § 600.6013. That statute provides:

"Sec. 6013. Interest shall be allowed on any money judgment recovered in a civil action, such interest to be calculated from the date of filing the complaint at the rate of 6% per year unless the judgment is rendered on a written instrument having a higher rate of interest in which case interest shall be computed at the rate specified in the instrument was executed. In no case shall the rate exceed 7% per year after the date judgment is entered. In the discretion of the judge, if a bona fide written offer of settlement in a civil action based on tort is made by the party against whom the judgment is subsequently rendered and the offer of settlement is substantially identical or substantially more favorable to the prevailing party than the judgment, then no interest shall be allowed beyond the date the written offer of settlement is made."

Prior to April 6, 1960, an insurance contract with a maximum liability of $50,000 was entered into between the plaintiff, MMPA, and the defendant Commercial Union Insurance Company (CU).[1] Under the terms of this agreement, CU agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ..." accident.

Supplemental provisions of the contract obligated CU to defend MMPA against any suit seeking damages payable under the policy, and to pay, in addition to the applicable limits of liability, "all costs taxed against the insured in any such suit or arbitration proceeding and all interest on the entire amount of any judgment and before the company has paid or tendered or deposited in court that amount of the judgment which does not exceed the limits of the company's liability thereon."

Under a separate condition of the policy, the contract became null and void where other insurance was available to the insured. In such a case, however, the defendant's policy acted as "excess insurance only." This condition reads as follows:

"14. *Other Insurance.* If other valid and collectible insurance exists protecting the insured against a loss covered by this policy, this policy shall be null and void with respect to said loss whether the insured is specifically named in such other policy of insurance or not; provided, however, that if the applicable limit of liability of such other valid and collectible insurance is not sufficient to protect the insured against such loss, this policy shall apply, but only as excess insurance over such other valid and collectible insurance in any amount equal to the applicable limit of liability of this policy and not as contributing insurance."

The judgment against MMPA was entered on July 30, 1974. Interest on this judgment, dating back to the filing of the original complaint on June 3, 1960, amounted to $82,381.23. The judgment plus inter-

1. MMPA was insured by a contract of insurance with Employers Liability Insurance Company. Employers was subsequently purchased by Commercial Union Insurance Company, defendant herein.

est was settled by a remittitur which reduced the judgment to $170,000 and paid by MMPA. Satisfaction was filed on October 16, 1974.

MMPA then sued Wolverine, claiming entitlement from the insurer to the entire amount of pre-judgment interest owing on the judgment, together with the $500.00 balance of the coverage afforded by the Wolverine policy. This litigation was settled in the approximate amount of $2,000, after MMPA concluded that on the basis of applicable state court decisions, Wolverine could be held liable only for interest on $500.00, the unpaid amount of its primary liability, rather than interest on the entire judgment. *See Cates v. Moyses,* 57 Mich. App. 405, 226 N.W.2d 106, *mod.* 394 Mich. 762, 228 N.W.2d 380 (1975); *Cosby v. Pool,* 36 Mich.App. 571, 194 N.W.2d 571 (1971), *lv. den.* 386 Mich. 782 (1972).

In March, 1976, MMPA commenced the instant action against CU for $42,468.00. This figure represents a pro-rata share of the pre-judgment interest based upon the amount of CU's maximum liability. MMPA subsequently amended its complaint, claiming that defendant is liable for interest not only on its policy limits of $50,000, but also on the entire amount of the judgment, that interest totalling approximately $82,381.23. MMPA argues that under Michigan law and for reasons of public policy, an insurance company is liable for pre-judgment interest on judgments rendered against its insured, even though that amount extends the insurer's liability beyond the maximum coverage specified in the policy. CU, on the other hand, contends that an excess carrier which had no control of the underlying litigation can be required to pay no more than the maximum amount of the liability it has contracted to pay.

On June 6, 1980, this court entered an opinion and order denying both parties' motions for summary judgment. The court held that under the Michigan statute, insurers with control over the insured's defense are obligated to pay any resulting pre-judgment interest. *Michigan Milk Producers*

*Association v. Commercial Union Insurance Company,* 493 F.Supp. 66 (W.D.Mich.1980). Summary judgment was denied because an issue of material fact remained unresolved, i.e., whether CU, as excess insurer, or Wolverine, as primary insurer, controlled the underlying litigation. Therefore, under the rule of this case, the court must determine which of these two insurance companies shall be held liable for the pre-judgment interest. If the court finds that Wolverine controlled the underlying litigation, i.e., the NYCR case against MMPA, then MMPA will recover nothing in this lawsuit. On the other hand, if it is determined that CU controlled the litigation, then it will be held liable for the pre-judgment interest.

## DISCUSSION

CU denies any duty to pay the pre-judgment interest at issue in this case. It argues first that under the terms of the insurance contracts between MMPA and Wolverine and CU respectively, Wolverine is liable for the interest. Additionally, CU disagrees with this court's interpretation of Michigan law which requires the insurer in control of the underlying litigation to pay pre-judgment interest. Finally, CU strenuously denies that it had any control over MMPA's defense against the NYCR lawsuit, and therefore, even if this court's interpretation of Michigan law is correct, the facts of this case and the actions of the parties do not justify the imposition of liability upon CU.

Pursuant to Fed.R.Civ.P. 52(a), the court will make specific findings of fact and state separately its conclusions of law with respect to several issues. The parties agree that the following issues of fact remain to be determined by the court:

(1) The amount of pre-judgment interest paid by MMPA, taking into account the remittitur.

(2) Whether CU in fact controlled the investigation, settlement, and defense of the *NYCR v. MMPA* case.[2]

**2.** MMPA would pose the second issue as follows: "Whether CU in fact exercised any control over the defense in the case of *NYCR v. MMPA,* and if so the extent of that control."

Determination of the rights and liabilities of the parties in this case requires resolution of several legal issues. The parties could not agree to a single formulation of these issues, but the court has determined that the various theories upon which the plaintiff and defendant rely will require answers to the following legal disputes:

(1) Did Wolverine, as the primary carrier with the contractual and legal duty to defend MMPA, thereby acquire control of the underlying litigation for purposes of the instant action as a matter of law?

(2) What is the effect of *Denham v. Bedford,* 407 Mich. 517, 287 N.W.2d 168 (1980), upon the rights and liabilities of the parties in this case?

(3) Is plaintiff precluded from suing CU by its election to sue Wolverine first for all of the pre-judgment interest and its (plaintiff's) settlement and release of Wolverine?

(4) Did plaintiff engage in any conduct during the litigation of the *NYCR v. MMPA* case that would estop plaintiff from maintaining that CU controlled that litigation?

(5) Is the imposition of pre-judgment interest upon an excess insurer an unconstitutional impairment of the insurance contract?

## A. FINDINGS OF FACT.

1. In its opinion of June 6, 1980, this court determined that the party controlling the underlying litigation is obliged to pay the interest on the judgment. 493 F.Supp. 66 at 72. The underlying litigation was the case *NYCR v. MMPA,* which resulted in a judgment for NYCR against MMPA. MMPA, as principal defendant and CU, as its insurer, paid their respective portions of the judgment.[3]

The record before the court leaves little doubt that control of the defense of the case on behalf of MMPA was controlled by CU, the defendant here. The following facts emerge from the evidence.

The original lawsuit filed by NYCR named as defendants MMPA and the owner of the truck, Elmer Myers. Shortly after the action was filed, CU retained Attorney G. Cameron Buchanan to defend the case on behalf of MMPA. Mr. Buchanan's role as "defense lawyer for the insurance company" was, in his words, to "give ... [both Commercial Union and MMPA] ... the same benefit of my advice. I owed the same duty to each of them." CU's involvement was, of course, due to its obligations as the excess insurer to MMPA.

Mr. Buchanan immediately took the position that MMPA was entitled to protection as a result of the Wolverine Insurance Company's obligations to Mr. Myers. Therefore, believing that Wolverine was liable for the cost of the defense, Mr. Buchanan tendered that defense to Wolverine. Mr. Buchanan stated in a letter to his client, CU, that "Wolverine accepted the obligation of defense and instructed me to proceed with the matter on their behalf." At this point, therefore, it appears that Mr. Buchanan was representing three clients: MMPA, CU and Wolverine.

Shortly before the first trial, a settlement was reached between Myers and the railroad. The cause was dismissed against him but proceeded against MMPA. *New York Central R. Co. v. Michigan Milk Pro. Ass'n.,* 3 Mich.App. 648, 143 N.W.2d 590 (1966). Mr. Buchanan conducted the defense in that litigation during which the principal issue in dispute was the alleged existence of an agency relationship between Myers and MMPA. The state court ultimately found MMPA liable on the agency theory.[4]

Turning now to the question of which party controlled the underlying litigation, the court finds that the defense of the *NYCR v. MMPA* action was conducted by Mr. Buchanan who perceived his principal obligation to be on behalf of Commercial Union. In Mr. Buchanan's words, "[t]his case ... resolved itself into the problem of

---

3. CU's policy limited its liability to $50,000.

4. The parties entered into an early stipulation as to damages. This stipulation and the proc- ess by which it was reached is instrumental in determination of the ultimate result in this case because it directly relates to the issue of who controlled the underlying litigation.

Commercial Union and MMPA and me as their lawyer with Wolverine simply . . . paying the bill." Additionally, Mr. Buchanan stated that he had no contact with MMPA until after the second judgment had been entered. And, with respect to Wolverine's participation in the defense, Mr. Buchanan stated that after the stipulation as to damages had been entered, Wolverine "walked away from this case in effect."[5]

In determining which party controlled the litigation below, I will examine three discreet phases of activity: investigation, settlement process, and defense of the litigation.

With respect to investigation, the record is somewhat blurred. However, Mr. Buchanan's deposition testimony shows that as counsel for MMPA and CU, he was intimately involved in the development of the case. CU argues that it did not participate "in those areas of the investigation upon which Wolverine was required to make its intelligent and informed decision of whether to settle or try the underlying litigation." Further, CU contends that it investigated "only limited facts at the direction of Wolverine and MMPA to enable Wolverine to more fully discharge its obligation to defend MMPA."

The record shows, however, that the investigation was handled by Buchanan and counsel for Myers, with Buchanan's preparation "to a great extent related to the practices of MMPA." Furthermore, Mr. Buchanan testified that he used the services of CU in connection with the investigation because "Commercial Union was MMPA's insurer and I used them to the extent that they had to know what I was doing."

The record contains other evidence showing CU's involvement, if not control, of the investigation and preparation prior to the *NYCR v. MMPA* trial. For instance, Leonard Glinski, a claims consultant for CU, stated that even after Wolverine accepted tender of the defense, CU's investigation into the relationship between Myers and Michigan Milk continued to completion. And it was this agency relationship that lay at the heart of the defense. While it may be true, as CU points out, that MMPA was involved in the investigation of the damage liability aspects of the case, these were settled before trial commenced, and Buchanan's testimony contradicts CU's contention that "Wolverine hired Buchanan to represent MMPA, . . . conducted the defense of the case and established trial strategy."[6]

In short, Buchanan was the key figure in the entire conduct of the defense in this case. And, though he had been authorized to proceed on behalf of Wolverine, it is clear from the evidence before the court that while Buchanan faithfully reported to both Wolverine and CU, he knew that Wolverine had much less at stake than did CU and, therefore, he perceived CU to be entitled to control the litigation.

Turning next to the question who controlled settlement discussions, it is clear from the record that such control was exercised through Buchanan, on behalf of MMPA, by CU. Glinsky testified that CU "never contemplated settling the case," and that Buchanan had no authority to settle the case without CU's approval. The record further reflects that Buchanan sought no direction from MMPA with respect to settlement discussions, and while no evidence exists of any interest on MMPA's part in settling the case, neither is there any evidence to support CU's contention that MMPA "flatly refused to entertain the possibility of settlement." To the contrary, it appears that CU was the party most adamantly resisting settlement, and in any event, Buchanan certainly understood that

---

**5.** According to Mr. Buchanan, Wolverine was not consulted on the decision to stipulate as to damages, and according to an executive from MMPA who was present during trial, nobody from his company was consulted as to the damage stipulation, even though it was for an amount far in excess of the company's insurance coverage. Mr. Buchanan was asked during his deposition upon whose authority he entered this stipulation and replied that "I would have to assume that it was with Commercial Union's approval. . . ."

**6.** Mr. Glinski further testified that Mr. Buchanan continued during the course of the *NYCR v. MMPA* case to report to CU on the progress, status, and tactics with respect to the case.

he could not settle the case without first getting CU's approval, even if he had been under pressure from MMPA to settle.[7]

Finally, the court has been shown no evidence of any participation by Wolverine in any settlement discussions concerning the *NYCR v. MMPA* case.

With regard to the third phase of the litigation, i.e., defense at trial, little doubt exists that CU was in control through its attorney Buchanan. In fact, it was CU's exposure to potential liability that brought Buchanan into the lawsuit in the first place and caused him to remain even after the defense had been formally tendered to the primary insurer. On the other hand, as Buchanan said, once Wolverine had accepted the defense, they essentially "walked away" from the case.

For example, the parties reached an early agreement on the amount of damages being litigated. In reaching this agreement, Buchanan consulted not with Wolverine, but with CU, because "really all ... [Wolverine] ... had at stake was to pay me." And, later, after the judgment had been entered and NYCR sought to collect from CU, Buchanan handled the payments in satisfaction of the judgment for CU.

In short, Wolverine's role in the litigation was limited solely to paying the legal expenses, an obligation which it accepted under the terms of its contract with Myers. It never asserted any control over the litigation, and did not care to, because as Buchanan stated, "they didn't have any interest in paying anything." In Buchanan's words:

"I would say that it was my belief then and is now my belief that Wolverine simply paid my expenses, that the control of the litigation was between MMPA and Commercial Union and I took the instructions from Commercial Union unless I talked with Barnes [of MMPA] in addition. Whatever those two people told me, I was guided by it."

CONCLUSION

Plaintiff has met its burden of proving that CU controlled the litigation underlying this case. The record is virtually devoid of any evidence suggesting Wolverine participation in the *NYCR v. MMPA* case, and similarly, little support exists for the claim the MMPA exercised any control whatever over the defense of the state action. This conclusion is thoroughly consistent with common sense, which would lead one to conclude that CU, as the party with the most to lose, would have been the party most interested in the case.[8] It is also consistent with and explicative of the manner in which Mr. Buchanan conducted the defense, believing as he did that the agency issue was certain to be resolved in favor of MMPA.

■ The only remaining factual issue is the determination of how much pre-judgment interest was paid by MMPA. The parties agree that the original judgment entered July 30, 1974, against MMPA was in the amount of $97,618.77, with interest thereon at 6% per annum from June 3, 1960. The parties further agree that MMPA later remitted and relinquished the amount of

7. Mr. Buchanan testified over defense counsel's objection at his deposition on July 31, 1980, that "[i]f there was a settlement proposition from the New York Central lawyer to me, I would have conveyed it to Commercial Union and I would have been qualified by their instructions." The court finds this testimony, though based on a hypothetical situation, to be highly relevant and material, contrary to defense counsel's objection. Mr. Buchanan continued, again over objection, to say with respect to a settlement offer that "if there was a disagreement between insurer and insured, then I would have been presented with a problem, but I wasn't in this case. Commercial

Union had control of the litigation." Defendant's objection to this testimony is overruled.

8. The court has not forgotten that MMPA was exposed to substantial uninsured liability in this case, i.e., approximately $50,000 worth after the stipulation as to damages. However, the record contains no evidence that MMPA and CU considered their interests adverse in the *NYCR v. MMPA* case. On the contrary, it is fair to infer from the evidence before the court that while CU may not have had the *right* to defend the case, *see* 493 F.Supp. at 72, it acted as though it had such a right and nothing suggests that MMPA would not have acquiesced to that view.

judgment, interest and costs in excess of the sum of $170,000.00. Of this amount, defendant paid $50,000. Later, Wolverine paid MMPA $2,000.

The parties now ask the court to determine what portion of the amount paid by MMPA was pre-judgment interest on the judgment. Plaintiff contends that interest on the judgment amounts to $82,381.23, and that under Michigan law it is entitled to recovery of the entire amount, regardless of the policy limits. Defendant argues that any recovery of pre-judgment interest must be limited to an amount based on the insurer's pro-rata share of the judgment. In other words, defendant claims that if it is liable for any of the interest, its liability should be limited to the interest on $50,000.

For the reasons set forth in the court's opinion of June 6, 1980, I conclude that the party who has full control over the underlying litigation is obliged to pay all of the pre-judgment interest.[9]

This result is consistent with the policy language, by which CU agreed to pay "all interest on the entire amount of any judgment...." *See Cates v. Moyses,* 57 Mich. App. 405, 226 N.W.2d 106 (1975).

B. LEGAL ISSUES.

The parties have raised several legal issues which must be resolved prior to final determination of their respective rights and liabilities.

■ 1. CU contends that Wolverine, as the primary carrier with the contractual and legal duty to defend MMPA, acquired control as a matter of law for purposes of the instant action. CU submits that Wolverine, as the party charged with the contractual duty to defend in the underlying litigation, should be obligated to pay the entire amount of pre-judgment interest.

Plaintiff contends that the policy language is not dispositive of the control issue. Conceding that Wolverine accepted tender of the defense, plaintiff argues that CU in

fact exercised control of that defense and, therefore, should be held liable for the pre-judgment interest.

The parties have cited no Michigan authority directed to the issue whether an insurer may be held liable as a matter of law for pre-judgment interest solely on the basis of policy language. However, based on the reasoning underlying the Michigan Supreme Court's decision in *Denham v. Bedford, supra,* as analyzed in this court's opinion at 493 F.Supp. at 71, I conclude that by formally accepting tender of the defense in the case *NYCR v. MMPA,* Wolverine did not thereby accept the obligation to pay all pre-judgment interest as a matter of law. The *Denham* decision was based in part upon public policy considerations. As the court stated:

"The result we reach today is fully supported by considerations of public policy. If we were to rule in favor of the insurer, the following would take place: the insured, not the insurer, would be responsible for the payment of the pre-judgment interest in excess of the policy limits and, presumptively, interest on the entire judgment as well. Such a result would appear unconscionable."

407 Mich. at 535, 287 N.W.2d at 174.

By accepting defendant's argument in the case now pending, the court would reach the very result condemned by the Michigan Supreme Court as "unconscionable." Therefore, consistent with the rationale of *Denham* and with this court's finding that CU controlled the underlying litigation, I conclude as a matter of law that Wolverine is not liable for pre-judgment interest despite the technicalities of the Wolverine contract by which it incurred such a liability. *See Denham v. Bedford,* 407 Mich. at 530–32, 287 N.W.2d at 171–73.[10]

■ 2. CU next argues that plaintiff is precluded from recovery in this action by its

---

**9.** 493 F.Supp. at 70–72.

**10.** In *Denham v. Bedford, supra,* the Michigan Supreme Court held that an insurer could be held liable for pre-judgment interest on por-

tions of a judgment representing its policy liability notwithstanding the fact that payment of such interest would cause the insurer to pay in excess of its policy limits.

election to sue Wolverine first for all of the pre-judgment interest and by its subsequent settlement and release of Wolverine. Defendant contends that if the two insurance companies are both liable for all the interest then a joint obligation for payment of pre-judgment interest existed and the release of one joint obligation constitutes the release of all. *Slater v. Ianni Construction Co.,* 268 Mich. 492, 256 N.W. 495 (1934).

This argument is unpersuasive. In the first place, the *Slater* case dealt with joint tortfeasors, not insurers. Secondly, while MMPA did release Wolverine, it did so only after concluding that the primary insurer was not liable under its contract and state case law beyond its pro-rata share of pre-judgment interest.[11] Finally, the court does not consider the two insurers to be "jointly liable" for the pre-judgment interest. Rather, the party in control of the underlying litigation is liable for all such interest or at the very least, its pro-rata share. Therefore, MMPA is not barred by its election to sue Wolverine or by its settlement with Wolverine from pursuing this action.

■ 3. Defendant's next ground for judgment on its behalf relates to MMPA's conduct during the trial of the state action. It is CU's contention that MMPA "flatly refused to entertain the possibility of settlement," presumably because it did not want to concede the existence of any agency relationship between itself and its haulers. If in fact MMPA "vehemently opposed settlement and was instrumental in making the case go to trial," as CU contends, this estoppel argument would have some force. However, the factual record before the court does not support defendant's assertions that MMPA prevented settlement. In fact, as the court concluded in its findings of fact, CU was the party responsible for the failure of settlement talks, and neither Wolverine nor MMPA has been shown to have played an active role in settlement negotiations. Therefore, MMPA is not estopped from seeking recovery against CU.

■ 4. Defendant claims that imposition of pre-judgment interest upon an excess insurer is an unconstitutional impairment of the insurance contract. It claims that it had no contractual obligation to pay interest because the policy itself (Condition 14) voids the Defense, Settlement and Supplementary Payments provision when CU acts as an excess carrier.

Condition 14 of CU's policy purports to void the policy except to the extent it applies as excess coverage over and above the limits of liability under other valid and collectible insurance. Therefore, says CU, no contractual basis exists to warrant the imposition of pre-judgment interest, and to do so would be to create a remedy where none existed.[12]

Defendant's interpretation of the contract conflicts with this court's earlier conclusion that "insurers with control over the insured's defense are obliged to pay the resulting pre-judgment interest." 493 F.Supp. at 72. This obligation is consistent with CU's undertaking to insure MMPA, and arises directly from that undertaking. To the extent that Condition 14 voids the contractual duty to defend, CU cannot assert that Condition when in fact it controlled the litigation on the defense side. And, to the extent that this result creates a remedy that has no literal basis in the terms of the policy, the court is satisfied that the remedy is the logical sequelae to CU's own conduct in asserting control of the defense through its counsel, Mr. Buchanan.

**11.** Condition 11 of the Wolverine policy reads as follows:

"If the insured has other insurance against a loss covered by this Policy other than under Coverage C-section (2) the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss, ..."

**12.** The court acknowledges distinctions cited by defendant between the policies at issue in this case and the policy under consideration in *Denham.* However, *Denham's* discussion of the constitutional issue is not wholly applicable here, where the defendant's obligation is based more on its actions than on the literal terms of its contract.

Therefore, CU cannot complain that its contract has been impaired in violation of the constitution. Had the excess carrier shown that it exerted no control over the *NYCR v. MMPA* litigation, then it could have avoided any liability for pre-judgment interest. Defendant's failure to make such a showing, and the overwhelming evidence of its control of the defense in the state action, provide sufficient grounds to justify a finding that it waived any argument based on impairment of its constitutional rights.

■ Finally, Michigan law holds that M.C.L.A. § 600.6013 did not create new remedies, but rather altered old ones. *Cosby v. Pool,* 36 Mich.App. 571, 194 N.W.2d 142 (1971). Thus, retroactive application does not violate the constitutional proscription against impairment of contracts.

### CONCLUSION

In defending this action, CU has raised numerous additional legal issues not herein discussed. The court acknowledges that these issues are relevant to this action and that in a different factual context, might be resolved in defendant's favor. However, by asserting and undertaking control of the underlying litigation in this case, defendant effectively repudiated its entitlement to its status as a mere excess insurer. Therefore, CU is liable for the entire pre-judgment interest on the settlement of the July 30, 1974, judgment in accordance with M.C.L.A. § 600.6013. Judgment shall be entered in accordance with this opinion.